UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID E. EICHAKER,

        Plaintiff,

                                    Case No.  1:12-CV-1350

v.

                                    HON. ROBERT HOLMES BELL

VILLAGE OF VICKSBURG,

        Defendant.

_____/

**O P I N I O N**

       This action alleging discrimination and retaliation because of military service is before the Court on Plaintiff David Eichaker's motion for partial summary judgment (ECF No. 67) and on Defendant Village of Vicksburg's motion for summary judgment.  (ECF No. 69.)  For the reasons that follow, Plaintiff's motion will be denied and Defendant's motion will be granted.

**I.**

       Plaintiff David E. Eichaker was hired by Defendant Village of Vicksburg ("the Village") as a part-time police officer in May 1999.  In October 1999 he was hired as a full-time police officer.  (Eichaker Dep. 11-12.)  Plaintiff has an honorable discharge from the United States Marine Corps and was in the Marine Corps Reserves when he began working for Defendant.  (*Id*. at 9, 17.)  In February 2001 Plaintiff joined the Michigan Air National Guard.  (*Id*. at 14.)  He continued in the Air National Guard during his employment with

Defendant and would periodically take leaves from his position as a police officer to attend military training and to perform military service. (*Id*. at 14-18.)

In May 2003 Plaintiff was promoted to the position of lieutenant, which was the second in command in the police department and a non-union position. After Plaintiff became lieutenant, Union Steward Eric West filed a grievance relating to him. According to Plaintiff, West was very pro-union. (*Id*. at 97-98.) Plaintiff contends that West objected to union members filling in for a non-union position while Plaintiff was on military leave. (*Id*. at 39-42.) West denies filing a grievance relating to Plaintiff's military leave. (West Dep. 39-43.) He contends that his grievance objected to Plaintiff, as a non-union employee, filling the union position of school resource officer. (*Id.*)

On two occasions Plaintiff filled in for Chief Descheneau while he was on leave: in 2003, Plaintiff filled in for six to eight months when the Chief was on a leave of absence for heart surgery, and in 2005 Plaintiff filled in for the Chief for eight or nine months while the Chief was in Afghanistan to assist in training the Afghani police force. (Descheneau Dep. 18-19; Eichaker Dep. 44, 53-54.)

In the spring of 2010 when Plaintiff learned that Chief Descheneau was planning to retire, Plaintiff advised Village Manager Matt Crawford that he wanted to speak to him about the police chief opening. Crawford told him "later," but never got back to him. (Eichaker Dep. 50-51; Pl. Ex. 16.) Chief Descheneau and Crawford recommended that

another officer on the force, Eric West, be appointed to be the next Chief of Police. The Village followed their recommendation and appointed West. (Def. Reply, Ex. B.)

West reorganized the police department, eliminating the lieutenant position and creating two sergeant positions. Because the lieutenant position was eliminated, Plaintiff was given the position of sergeant, which is a union position. In the course of advising Plaintiff about the restructuring of the department, West said, "You think you can go on military leave whenever you feel like it." (Eichaker Dep. 60.) Plaintiff did not know what West meant, but he surmised that West figured that by eliminating the lieutenant position, it would no longer be a problem when Plaintiff went on military leave because he could fill Plaintiff's union position with a union employee. (Eichaker Dep. 71-73.)

When Plaintiff became a sergeant his hourly pay rate remained the same but he was not able to earn the same level of income. As a union member, Plaintiff had to pay for health insurance and union dues, he was not entitled to a pay differential when he was on military duty, and he lost longevity bonuses. (Eichaker Dep. 64-65; Pl. Ex. 16; West Dep. 82, 86.) In addition, as a lieutenant, Plaintiff had worked Monday through Friday, and earned additional pay on his military weekends. (West Dep. 82.) As a union employee, Plaintiff was sometimes scheduled to work weekends, so when he had weekend military duty, he worked fewer hours for the Village. (West Dep. 83.)

Plaintiff was not happy with the restructuring of the police force because it negatively affected his income. (Pl. Ex. 16; West Dep. 64, 87.) He also felt that he was receiving the

silent treatment from Crawford and West.  (Eichaker Dep. 61, 87-88.)  On July 19, 2010, Plaintiff blamed West for his financial losses, and told West he was considering contacting the Employer Support Guard and Reserve ("ESGR") about his loss of income.  (Eichaker Dep. 74-76; West Dep. 87.)  The ESGR mediates disputes between employers and citizen soldiers.  (Eichaker Dep. 76.)  From West's perspective, Plaintiff had been repeatedly attacking him from the time he learned of West's appointment as chief, and Plaintiff appeared to be set on keeping track of West's mistakes and broadcasting them in an effort to make West's life difficult.  (West Dep. 87-99.)  West lost his temper, yelled at Plaintiff, asked if he was threatening him, and stormed out. (*Id.*)  When West returned, he demanded that Plaintiff turn over the chief's office key and told him he did not trust him.  (*Id.* at 77.)

The following day West and Plaintiff met to discuss what happened the day before. (Eichaker Dep. 78; West Dep. 95-96.)  West told Plaintiff he could go on military leave whenever he felt like it.  (Eichaker Dep. 78.)  As a result of their discussion, West decided to discipline Plaintiff with a counseling memo rather than demoting him to the rank of patrolman.  (Pl. Ex. 12.)  On July 21, 2010, West issued Plaintiff a counseling memo for his "unsubstantiated allegations and attacks on my personal reputation, and professional integrity," and indicated that Plaintiff's "threats and attempts to discredit me were conduct unbecoming and insubordination."  (Pl. Ex. 12; West Dep. 96.)

Following their July 20, 2010, discussion, West agreed with Plaintiff that he should receive longevity pay for the past six months when he was still the lieutenant.  (Eichaker

4

Dep. 90; West Dep. 180-81.)  On July 23, 2010, West recommended to Village Manager Crawford that Plaintiff be paid 1/2 of 3% of his base salary and receive the normal longevity as scheduled with the union.  (Def. Ex. F.)

On December 14, 2010, West issued Plaintiff a counseling memo for leaving his duty post before his shift ended and before he was properly relieved of duty by another officer. (Def. Ex. J.)

After the July 2010 counseling memo West learned from other officers that Plaintiff was continuing to attack him and that Plaintiff was keeping track whenever West broke his own rules.  (West Dep. 109-113.)  When West called Plaintiff in, Plaintiff said West was on a witch hunt, that he did not follow his own rules, and that he was a bad chief.  (West Dep. 110.)  On January 24, 2011, West demoted Plaintiff from sergeant to patrolman for his continued attempts to discredit West as the Chief of Police.  (Pl. Ex. 13; Def. Ex. K, L.)  The following day, Plaintiff filed a grievance against West for the disciplinary actions he took against Plaintiff on January 24, 2011.  (Pl. Ex. 20.)  West denied the grievance.  (Pl. Ex. 21.) Plaintiff filed a revised grievance on January 30, 2011.  (Pl. Ex. 22.)  Chief West denied the grievances on February 7, 2011.  (Pl. Ex. 23.)

As of July 1, 2011, Plaintiff's seniority date was listed as October 1, 1999.  Based on this seniority date, Plaintiff was able to out-bid Officer Petersen for a particular work shift. Four officers filed a grievance contending that, pursuant to the collective bargaining agreement, seniority is based on "last hiring date;" Plaintiff's last hiring date was July 1,

2010, when he was re-hired into the bargaining unit, not October 1, 1999, when he was initially hired by the Village; and Plaintiff could not accrue seniority when he was a lieutenant and was not a member of the union. (Def. Exs. G, H.) On September 4, 2012, the arbitrator determined that Plaintiff's seniority terminated when he quit his union position in 2003 to accept a supervisory position outside the bargaining unit. (Def. Ex. I.) The arbitrator accordingly granted the grievance and held that Plaintiff's seniority date must be adjusted to July 1, 2010.

In October 2011, Plaintiff filed a harassment claim against Village Manage Crawford and Police Chief West. (Pl. Ex. 16.)

In October 2011 West did not ask Plaintiff to participate in a funeral procession for a soldier killed in Afghanistan. Plaintiff was offended by this slight because he was an active member of the military. West explained that it was a privilege for the village to honor this fallen military veteran, and he did not want a disgruntled employee to do anything to disrupt that service, such as failing to obey one of his orders. (West Dep. 122-23.)

In late October 2011 Plaintiff was called to active duty in Afghanistan. Chief West required Plaintiff to turn in his weapon, his police I.D. card, and his badges. (Eichaker Dep. 138.) Previously, Plaintiff had never been required to turn in his I.D. card when he was on leave of absence for military service. (Eichaker Dep. 138-39.)

Plaintiff was on military leave from November 1, 2011, to November 16, 2012. Defendant continued Plaintiff's health insurance, union dues, and disability insurance while

6

he was on military leave without Plaintiff's consent.  (Eichaker Dep 144-52; Eichaker Aff.)
Although Defendant initially took some of the  payment for the benefits from Plaintiff's paid
time off ("PTO") account, Defendant returned those funds and billed Plaintiff for the
payments.  (Pl. Ex. 1; Pl. Ex. 2; Kiel Dep. 27-32, 41-42.)   In May 2012, while Plaintiff was
on military leave, Plaintiff received a bill for unpaid health insurance premiums, union dues,
disability insurance premiums, and other dues that had been continued without Plaintiff's
permission.

On October 19, 2012, Plaintiff requested a leave of absence for an unspecified time
period beginning November 1, 2012, because of his unresolved disputes with the police
department and the Village.  (Pl. Ex. 18.)  Plaintiff subsequently clarified his request for a
six-month leave of absence.  (Pl. Ex. 19.)  On November 9, 2012, Village Manager Crawford
denied Plaintiff's request for a leave of absence and directed him to return to work or he
would be deemed to have resigned. (Pl. Ex. 19.) When Plaintiff did not return to work, the
village accepted his voluntary resignation.

In February 2012, Plaintiff filed a formal complaint of USERRA violations with the
ESGR and in March 2012 he filed a complaint with the Department of Labor.

## II.

The Federal Rules of Civil Procedure require the Court to grant summary judgment
"if the movant shows that there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In evaluating a motion for

summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the movant carries its burden of showing there is an absence of evidence to support a claim, the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In reviewing a motion for summary judgment this Court cannot weigh the evidence, make credibility determinations, or resolve material factual disputes. *Alman v. Reed*, 703 F.3d 887, 895 (6th Cir. 2013); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (stating that on a motion for summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569-70 (6th Cir. 2012) (citing *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc*., 573 F.3d 365, 374 (6th Cir. 2009)). Nevertheless, the mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient to create a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252. The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

Plaintiff alleges that Defendant discriminated and retaliated against him because of his military service in violation in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.*

USERRA prohibits employers from discriminating against individuals because of their military service or retaliating against them for exercising their rights under USERRA. 38 U.S.C. § 4311. "'Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries.'" *Petty v. Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 439 (6th Cir. 2008) (quoting *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 303 (4th Cir. 2006)).

USERRA prohibits adverse employment actions "if the person's obligation for military service 'is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such . . . obligation for service.'" *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 754 (6th Cir. 2012) (quoting 38 U.S.C. § 4311(c)(1)). The plaintiff carries the initial burden to show by a preponderance that his protected status was a motivating factor in an adverse employment action. *Id.*

"Discriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason

9

for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Bobo*, 665 F.3d at 754.

If the plaintiff carries his burden of showing by a preponderance that his protected status was a motivating factor in a materially adverse employment action, the burden shifts to the employer to prove affirmatively that it would have taken the same employment action in the absence of the plaintiff's protected status. *Id.*

In his complaint Plaintiff identifies nine ways in which he was discriminated or retaliated against:

> A. Demoting him and not returning him to his prior position;
> B. Reducing his pay;
> C. Eliminating his seniority;
> D. Reprimanding and disciplining him;
> E. Refusing to respond to his complaints of harassment;
> F. Deducting monies for health insurance and other items without his permission;
> G. Not promoting him to police chief;
> H. Not granting him a leave of absence;
> I. Threatening to terminate him.

(Compl. ¶ 52.)

Courts that have considered the issue have uniformly agreed that the same requirement of a "materially adverse" employment action that applies to other civil rights statutes also applies to USERRA. *See Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011); *Lisdahl v. Mayo Found.*, 633 F.3d 712, 721 (8th Cir. 2011); *Croft v. Vill. of Newark*, No. 09-CV-6567, 2014 WL 3866130, at *10 (W.D.N.Y. Aug. 5, 2014); *Otero v.*

10

*New Mexico Corr. Dep't*, 640 F. Supp. 2d 1346, 1356 (D.N.M. 2009). Thus, in order to make out a prima facie case under USERRA, Plaintiff must show that he has suffered a "materially adverse change in the terms and conditions" of his employment. *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc)). A "'mere inconvenience or an alteration of job responsibilities'" is not sufficient. *Id.* (quoting *White*, 364 F.3d at 797). "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms of the conditions of employment." *Deleon*, 739 F.3d at 919.

Plaintiff's allegations that Defendant refused to respond to his complaints of harassment, failed to grant him a leave of absence, and threatened to terminate him (Compl. ¶¶ E, H, I), do not amount to a quantitative or qualitative change in the terms of the conditions of employment. *See Deleon*, 739 F.3d at 919. They provide relevant background information about how he was treated by Defendant, but they do not qualify as materially adverse employment actions. The Court will focus on the remaining six allegations and will address them in chronological order, rather than in the order presented in the complaint.

## A. Failure to Promote to Police Chief

Plaintiff asserts that he was not promoted to police chief because of his military service. In support of his contention that his military service was a motivating factor in the decision not to promote him, Plaintiff points to evidence that he "served with distinction and

without scandal" while covering for Chief Descheneau on two occasions, and he received excellent performance evaluations from Chief Descheneau. (Descheneau Dep. 55-58.)

Even if Plaintiff was qualified for the position and expected to be promoted to the position, that evidence is not by itself sufficient to make out a USERRA claim. It is Plaintiff's burden "to show not simply that the agency improperly failed to select him for the position, but that its failure to do so was attributable to discrimination against him because of his status as a [serviceman]." *Burroughs v. Dep't of Army*, 254 F. App'x 814, 816 (Fed. Cir. 2007) ("The key element of a claim under USERRA thus is discrimination on the basis of military service; it is not enough to show simply that the claimant is a veteran and should have been selected for a particular position, but was not."); *see also Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1015 (Fed. Cir. 2001) ("[C]laimants must show evidence of discrimination other than the fact of non-selection and membership in the protected class.").

In this case, Plaintiff has presented no direct evidence of anti-military animus. Plaintiff admitted that he never heard West, Crawford, or any other Village official or employee make any statements that he believed were anti-military. (Eichaker Dep. 48.) The only information Plaintiff relies on in support of his assertion that his military service was a motivating factor in the decision not to promote him, is his assertion that the Village Manager told the Village Council that Plaintiff was not interested in the Chief position because he wanted to focus on his military career. (Pl. Resp. Br. 12; Eichaker Dep. 95, 98.) Plaintiff allegedly heard this from Christina Klok, a member of the Village Council.

12

Christina Klok testified, however, that Crawford did not tell the counsel that Plaintiff was not interested in the position.  She testified that in response to her question as to whether Plaintiff had any interest in the position, Crawford commented that Plaintiff had a young family and a military career he was pursuing.  (Klok Dep. 13, 18.)

Assuming Crawford isolated comment is sufficient to meet Plaintiff's initial burden of showing that his protected status was a motivating factor in an adverse employment action, Defendant has established that it would not have selected Plaintiff for the chief position even in the absence of his protected status.  The recommendation for the new chief was made by Chief Descheneau and Village Manager Crawford.  (Pl. Ex. 14.)  The evidence is unrebutted that both Crawford and Descheneau believed that West was the better candidate for reasons unrelated to Plaintiff's military service.  Crawford told Descheneau that he had not been happy with Plaintiff's performance when he filled in for Descheneau, and he did not want Plaintiff to be the next chief.  (Descheneau Dep. 20, 26.)  Crawford advised the Council that he was recommending West because he was very organized and was a follow-the-book kind of man and mature.  (Klok Dep. 14.)  He also questioned whether Plaintiff was ready for the kind of responsibility that went with the position of Chief.  (Kiel Dep. 17-18.)  Crawford told Plaintiff that he did not recommend him for the Chief position because he was not the "asshole" that Crawford was looking for.  (Eichaker Dep. 86, 89-92; Crawford Dep. 74.)  By that, Crawford meant that West had the type of personality he wanted.  He had a stronger, more forceful personality, and would not be a pushover.  (Crawford Dep. 75.)

13

Descheneau testified that although he gave Plaintiff good work evaluations, and although he could not recall any serious criticisms of Plaintiff's performance when he filled in for Descheneau, Descheneau did not consider him to be qualified to be police chief. (Descheneau Dep. 19-20, 50-58, 60.) Even if Crawford had not expressed his feelings about Plaintiff, Descheneau would not have recommended Plaintiff for the Chief position because on two separate occasions Plaintiff informed Descheneau that he did not feel that he was ready to handle the politics or the pressures of the police chief's job. (*Id.* at 28, 60.) Descheneau thought that, given time, Plaintiff could probably have managed the job, but he would have struggled and would have had difficulty dealing with the officers because he was not well liked. (*Id.* at 60-61.) Descheneau was afraid that putting him in the position of Chief at that time would have been setting him up to fail. (*Id.* at 60.) In light of Crawford's desire to hire from the inside so that they could eliminate a position, Descheneau determined that West was the only logical choice for the position. (*Id.* at 26-27.) West was a good police officer, was very knowledgeable of the law, had a background in emergency situations, had worked as a union representative, and was well respected by the officers in the department. (*Id.* at 27.)

Based on the record, the Court finds, as a matter of law, that Plaintiff's protected status was not a motivating factor in the decision to select West rather than Plaintiff for the position of Chief of Police.

## B.  Change in Status from Lieutenant to Sergeant

Plaintiff asserts that his demotion from lieutenant to sergeant is evidence of anti-military bias.

Plaintiff's change in status from lieutenant to sergeant was not a typical demotion. It was not based on punishment.  The lieutenant position had been created in response to the September 11, 2001, disaster, when the Chief of Police had additional duties placed upon him. (Pl. Ex. 14.) Prior to his retirement, Chief Descheneau discussed with Village Manager Crawford the idea of restructuring the department to eliminate the lieutenant position and replace that position with two sergeant positions.  (*Id.*).  West began working on the restructuring after before West became Chief, and his proposed plan was approved by Chief Descheneau.  (Eichaker Dep. 61-62; West Dep. 63-64.)  West advised Crawford that he wanted all of the officers to be under the union contract because it would be best for morale and for the operations of the department.  (Crawford Dep. 77.)

The evidence is unrefuted that the lieutenant position was created and then eliminated for reasons unrelated to Plaintiff.  When the lieutenant position was eliminated, Plaintiff was offered the position of sergeant at the same pay rate.  Plaintiff has offered no evidence to suggest that the restructuring was motivated by a desire to disadvantage him, much less to disadvantage him because of his military service.  Plaintiff has not met his burden of showing that the restructuring of the department was motivated by his military service or by anti-military animus.

15

## C. Reprimands and Discipline

After West became Chief, West gave Plaintiff a counseling memo for insubordination and conduct unbecoming an officer, a second counseling memo for leaving his post early, and then demoted him to a patrolman position for continuing to undermine his authority.

Plaintiff's assertion that the discipline was motivated by his military service is not supported by the record. The only evidence Plaintiff has offered with respect to the anti-military animus is the combination of West's alleged 2003 grievance regarding union members filling in for a non-union position while Plaintiff was on military leave, and West's statement that "[y]ou think you can go on military leave whenever you feel like it." (Eichaker Dep. 60.) Plaintiff acknowledged that he did not know what West meant by this statement, but he surmised that West figured that by eliminating the lieutenant position, it would no longer be a problem when Plaintiff went on military leave because he could fill Plaintiff's union position with a union employee. (Eichaker Dep. 71-73.)

Although Plaintiff does not think his conduct warranted discipline, he does not deny that he challenged West's elimination of the lieutenant position and his loss of income, nor does he deny that he left his post early. He not shown that others were not disciplined for the same conduct, nor has he suggested that the Chief's perception that Plaintiff was trying to embarrass and discredit him was unfounded. "USERRA does not exempt those in the military from complying with the usual rules of behavior in the workplace or being subject to the usual discipline." *Bradberry v. Jefferson Cnty., Tex.*, 732 F.3d 540, 551 (5th Cir. 2013).

Even if Plaintiff is correct about the subject matter of West's 2003 grievance, and even if he correctly discerned West's motivation for eliminating the non-union lieutenant position, Plaintiff has not shown that this amounts to anti-military animus. West, who had been union steward, was familiar with issues that arose between union and non-union employees, and his desire to reduce conflicts is not evidence of anti-military animus.

**D.  Loss of Seniority**

Plaintiff contends that Defendant stripped him of eleven years of seniority because of his military service or in retaliation for his exercise of his rights under USERRA. Plaintiff's claim lacks evidentiary support.

Seniority is a matter of union contract. Other officers filed a grievance asserting that Plaintiff lost his seniority when he left the union to become lieutenant and established a new hire date of July 1, 2010, when the lieutenant's position was eliminated and Plaintiff returned to the union. The Village defended the decision to keep Plaintiff's hire date as October 1, 1999, but eventually lost at arbitration. (Arbitrator's decision, September 4, 2012, Ex. I). The undisputed evidence reveals that Plaintiff  lost his seniority due to the terms of the union contract and the findings of an arbitrator, not because of any adverse action taken by Defendant.  There is no evidence to substantiate Plaintiff's claim that the loss of seniority was motivated by anti-military animus.

**E.  Pay Differential**

As evidence that he was discriminated against for his military service, Plaintiff

17

identified the fact that before West became Chief, Plaintiff would receive a pay differential from the Village when he was on active military duty. (Eichaker Dep. 64-69.)  After West became Chief, he advised Plaintiff that if he wanted a pay differential he would have to use his vacation time. (Eichaker Dep. 69.)

The undisputed evidence reveals that the difference is largely attributable to Plaintiff's change in status from non-union to union.  While Plaintiff was a lieutenant, he was governed by the Village policy rather than by the union contract.  As West explained, the Village policy allowed for a pay differential for non-union employees but the union contract addressed the issue explicitly and provided that a pay differential would only be paid if the recipient used vacation time. (West Dep. 85-86.)  Plaintiff acknowledges that the union contract provided that he would have to use vacation time if he wanted a pay differential. (*Id.*)

Plaintiff asserts, however, that under Chief Descheneau he received a pay differential even before he became lieutenant and was still a union member.  Regardless of what Chief Descheneau may have done prior to 2003 when Plaintiff was a union member, Plaintiff has not shown that West deviated from the requirements of the union contract.  Accordingly, Plaintiff has not shown that he was discriminated against on the basis of his military status.

**F.  Deductions and Billing for Benefits**

Plaintiff asserts that his rights under USERRA were violated when the Village deducted money from Plaintiff's paid time off ("PTO") to pay for Plaintiff's health insurance

18

premiums and other items while Plaintiff was deployed in Afghanistan, without his permission. Plaintiff has requested partial summary judgment on his request for a declaration that Defendant's conduct was unlawful under USERRA and an injunction enjoining Defendant from seeking collection on an invoice for the health insurance premiums paid on Plaintiff's behalf.

Plaintiff did not need insurance while he was on active duty with the military because the military provided health insurance to Plaintiff and his family during that time. Prior to his deployment to Afghanistan in the fall of 2011, Plaintiff did not advise the Village whether he wanted to continue or discontinue his health benefits. (Eichaker Dep. 150; Kiel Dep. 24-26, 28.)

For purposes of this opinion the Court will assume that Defendant's withdrawal of money from Plaintiff's PTO account was not proper. However, Plaintiff has not shown that the withdrawal violated USERRA. More importantly, that money was returned to Plaintiff's PTO account, so there is no harm stemming from that action and no need for declaratory or injunctive relief.

That leaves the question as to whether Defendant violated USERRA when it billed Plaintiff for health insurance. Plaintiff acknowledges that insurance premiums are deducted pursuant to the union contract. (Eichaker Dep. 150-51.) According to Plaintiff, the union contract is silent with respect to what should happen in the event of military service. (*Id.* at 151.) Plaintiff did not elect to continue his health insurance after he was deployed. His

19

benefits were continued because he did not affirmatively request to cancel them.  As Crawford testified, "[Eichaker] elected coverage by signing up with Blue Cross/Blue Shield, and as an employee that coverage is there until he elects not to have that coverage." (Crawford Dep. 148.)

USERRA provides that when a person has coverage under a health plan in connection with his employment, and the person is absent from work due to military service, "the plan shall provide that the [service] person may elect to continue such coverage."  38 U.S.C. § 4317(b)(1).  USERRA does not prohibit an employer from continuing health care coverage and requiring payments for that coverage by a military service member.  USERRA is focused on a serviceman's right to continued coverage, and on prohibiting employers from improperly discontinuing coverage.  USERRA does not speak to a servicemember's right to discontinue coverage, nor does it prohibit an employer from continuing coverage for a servicemember who has not specifically chosen to continue it.  The plain language and intent of USSERA is to protect the ability of employees on military leave to maintain their health care coverage, not to punish employers for maintaining health care coverage for those employees who have not made an election to discontinue coverage.  Plaintiff has not pointed to any language in USERRA that would require a plan to discontinue coverage for a serviceman who has made no choice on whether to continue or to discontinue coverage during his deployment.  Indeed, it would likely be a violation of USERRA or the union contract if the Village discontinued Plaintiff's benefits during his deployment if Plaintiff did not specifically request such an action.

Plaintiff faults the Village for failing to advise him that he had the right to discontinue his health insurance. (Eichaker Aff.)  When the Village became aware of Plaintiff's dissatisfaction with the deductions for insurance, it certainly could have inquired as to Plaintiff's preference on the issue of the continuation or cancellation of health insurance. Defendant does not deny that Plaintiff may have a claim for reimbursement, but Defendant moves for summary judgment in its favor regarding the deductions for health insurance and union dues because Defendant's conduct was not unlawful under USERRA.  If Plaintiff has a claim regarding the handling of his insurance, it is not one cognizable under USERRA. Plaintiff has not shown that he has a claim under USERRA for the manner in which Defendant administered his health benefits.

## IV.

Plaintiff has presented evidence that after West became chief, he lost status, respect, and income in the police force.  Nevertheless, he has not presented evidence to create an issue of fact for trial as to whether his military service was a motivating factor in the adverse employment actions taken against him.  In addition, Plaintiff has not shown that Defendant's continuation of Plaintiff's health insurance while Plaintiff was deployed violated USERRA. Accordingly, Defendant's motion for summary judgment will be granted and Plaintiff's motion for partial summary judgment will be denied.

An order and judgment consistent with this opinion will be entered.


Dated: <u>January 8, 2015</u>                              <u>/s/ Robert Holmes Bell</u>
                                                          ROBERT HOLMES BELL
                                                          UNITED STATES DISTRICT JUDGE